1
2
3
4
5

Tracey L. Brown (SBN 166152)
tbrown@cochranfirmny.com
Derek S. Sells
dsells@cochranfirmny.com
The Cochran Firm, PLLC
55 Exchange Plaza, 23rd Floor
New York, NY 10006
Tel No.: (212) 553-9214
Fax No.: (212) 227-8763
Attorneys for Plaintiff Ameer Hasan Loggins

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

AMEER HASAN LOGGINS, Ph.D

Plaintiff,

vs.

LELAND STANFORD JUNIOR
UNIVERSITY,
KEVIN T. FEIGELIS individually,
R. LANIER ANDERSON, individually
DAN EDELSTEIN individually,
PARNA SENGUPTA individually,
ELIZABETH SOROKA individually
JENNY S. MARTINEZ individually,
RICHARD SALLER individually,

Defendants.

Case No.: 3:24-cv-02027

**FIRST AMENDED COMPLAINT FOR**
**DAMAGES AND INJUNCTIVE RELIEF:**

1. **SECTION 1981 DISCRIMINATION**
2. **STATE DISCRIMINATION**
3. **RETALIATION (Cal. Gov. Code)**
4. **FAILURE TO PREVENT FEHA**
   **VIOLATIONS**
5. **RETALIATION (Lab. Code)**
6. **TITLE VII DISCRIMINATION**
7. **TITLE VII RETALIATION**
8. **DEFAMATION**

**JURY TRIAL REQUESTED**

## I.   NATURE OF THE ACTION

1. Plaintiff Ameer Hasan Loggins, PhD  ("Plaintiff" and/or "Dr. Loggins "), by and through his attorneys, the Cochran Firm, brings this individual action against his former employer LELAND STANFORD JUNIOR UNIVERSITY, KEVIN T. FEIGELIS (individually), R. LANIER ANDERSON (individually), DAN EDELSTEIN (individually), PARNA SANGUPTA (individually), ELIZABETH SOROKA (individually), JENNY S. MARTINEZ (individually), and RICHARD SALLER (individually).

2. Plaintiff alleges, upon knowledge as to himself and otherwise upon information and belief, that Defendants engage in a pattern and practice of discrimination based on race, color, and religion, as well as a hostile work environment, and retaliation and wrongful suspension.

3. Plaintiff alleges violations of the Fair Employment and Housing Act ("FEHA") based on his race, color, and religion, protected oppositional activities, and for seeking legal assistance to combat the discriminatory and retaliatory practices employed by defendants.

4. Plaintiff also brings claims of discrimination and retaliation under 42 U.S.C. § 1981 ("1981") and Title VII.

5. Plaintiff alleges Defendants deprived Plaintiff of the following "employment benefits," as that term is defined in Cal. Code Regs., tit 2, § 11008, subd. (g), and used in Cal. Code Regs., tit 2, § 11008, subd. (h), (hereinafter referred to as "adverse employment actions") by, *inter alia:*

    a. denying Plaintiff a workplace free from discrimination and retaliation, in violation of Gov. Code, § 12940, subds. (a), (h), (k); Gov. Code, § 12945.2, subds. (l)(1), (t); Cal. Code Regs., tit. 2, § 11094, subds. (b), (d); 29 U.S.C. § 2616 (a)-(b)(1);

    b. failing to train staff to proficiency regarding FEHA rights and responsibilities, in violation of Gov. Code, § 12940, subd. (k);

COMPLAINT

**6.** Plaintiff is a victim of this aforesaid discriminatory pattern and practice and these aforesaid violations and has suffered unlawful retaliation for pursuing reports and complaints of discrimination on behalf of himself and others, including this suit.

## II.   PARTIES

**7.** Plaintiff Ameer Hasan Loggins  (hereinafter referred to as "Dr. Loggins " and/or "Plaintiff") is an individual black, African American, Muslim male who is a resident of the State of California. Plaintiff is therefore a member of multiple protected classes. Plaintiff has enjoyed a good reputation, both generally and in his occupation as a lecturer. He earned his Doctoral Degree in 2019 from the University of California at Berkeley.

**8.** At all times material, Defendants have been aware of Plaintiff's race, color, and religion.

**9.** At all times material, Defendant LELAND STANFORD JUNIOR UNIVERSITY (hereinafter referred to as "**STANFORD**" and/or "Defendants **STANFORD**") was, and still is, a nonprofit educational corporation, duly organized and existing under and by virtue of the laws of the State of California.

**10. STANFORD** is a multi-billion-dollar endowed private research institution that is one of the most prestigious universities in the world:



## Stanford University

Coordinates: 37°25′39″N 122°10′12″W

**Stanford University** (officially **Leland Stanford Junior University**)[12][13] is a private research university in Stanford, California. The campus occupies 8,180 acres (3,310 hectares), among the largest in the United States, and enrolls over 17,000 students.[14] Its influence, wealth, and rankings have made it one of the most prestigious universities in the world.[a]

**Stanford** News (http://news.stanford.edu/)

OCTOBER 12, 2023

## Stanford University reports return on investment portfolio, value of endowment

Stanford University reported returns on its investment portfolio as of June 30, 2023, and the value of its endowment as of the close of its fiscal year, August 31, 2023.

Stanford University today announced a 4.4% investment return in its Merged Pool, net of all external and internal costs and fees, for the year ending June 30, 2023. The Merged Pool is the principal investment vehicle for the university's endowment.

Stanford's performance trailed the 6.9% median return for U.S. college and university endowments for the year, as preliminarily reported by Cambridge Associates. A typical "70/30" passive portfolio of global stocks and high-quality U.S. bonds returned 10.9% over the same period.

Stanford's five- and 10-year net annualized investment performance of 9.5% and 9.4%, respectively, compares with the median college and university endowment return of 8.0% and 7.6% over the same time periods. A typical "70/30" passive portfolio returned 5.8% and 6.6% over the last five and 10 years, respectively.

"Strong results in most asset classes during the past year were partially offset by losses in our venture capital and growth equity portfolios, continuing a correction that began in 2022," said Robert Wallace, chief executive officer of Stanford Management Company. "Viewed over multiple years, our disciplined and diversified investment approach has delivered attractive returns with moderate volatility."

The value of the Merged Pool was $40.9 billion as of June 30, 2023. The fund also includes capital reserves of Stanford Health Care and Stanford Medicine Children's Health, along with other long-term funds.

The value of the university's endowment, which includes approximately 75% of the Merged Pool as well as other assets such as real estate, was $36.5 billion on Aug. 31, 2023, the end of its fiscal year. The endowment is intended to sustain university programs over the long term, and a payout each year provides critical support for current operations.

In fiscal year 2023, the endowment disbursed $1.7 billion to support vital academic programs and financial aid. Payout from the endowment funded over 22% of the university's 2023 operating expenses. For fiscal year 2024, payout from the endowment is budgeted at $1.8 billion. The endowment must grow with inflation to maintain its purchasing power and support the university's and donors' commitment to students, faculty, and projects for decades to come.

The endowment includes more than 7,900 funds established by philanthropic donors over the years and designated for specific purposes. They support student scholarships and also advance particular fields of study through professorships, fellowships, and research funds.

Stanford Management Company invests the endowment and other financial assets to provide long-term support to the university. Careful stewardship of endowed funds helps ensure that important resources, including financial aid, are available for present and future generations of students, faculty, staff, and patients.

Stanford Management Company invests capital in accordance with its Ethical Investment Framework and strives to work with the most capable partners pursuing disciplined, long-term investment in the U.S. and across the world.

**11.** At all times material, **STANFORD** acted, and continues to act, by and through their employees, agents, and servants in the scope and course of employment, agency, and servitude.

**12.** At all times material, Mr. KEVIN T. FEIGELIS (hereinafter referred to as "**FEIGELIS**"), was, and still is, a postdoctoral researcher at **STANFORD**. Upon information and belief, **FEIGELIS** is an individual non-black, non-African American, non-Muslim man, who serves as an employee of Stanford in the role of assistant teacher, researcher and/or other paying position. **FEIGELIS** contributed to **STANFORD**'s misconduct, including retaliation, and personally violated Dr. Loggins' rights  and  publicly defamed Plaintiff.



**13.** At all times relevant, **STANFORD** employed Defendant Mr. R. LANIER ANDERSON, (hereinafter referred to as "**ANDERSON**"), as a Professor, and Senior Associate Dean. Upon information and belief, **ANDERSON** is an individual non-black, non-African American, non-Muslim man.

**14. ANDERSON** held, and still holds, a supervisory position at **STANFORD**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

**15. ANDERSON** was an active participant and a driving force in the unlawful discrimination, harassment, hostile work environment, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff, and aided and abetted same as Plaintiff's supervisor.



# Stanford

## R. Lanier Anderson

Vice Provost for Undergraduate Education, J. E. Wallace Sterling Professor of the Humanities, Professor of Philosophy and, by courtesy, of German Studies

📄 Curriculum Vitae available Online

**16.** At all times relevant, **STANFORD** employed Defendant Mr. DAN EDELSTEIN (hereinafter referred to as "**EDELSTEIN**"), as a Professor. Upon information and belief, **EDELSTEIN** is an individual non-black, non-African American, non-Muslim man.

**17. EDELSTEIN** held, and still holds, a supervisory position at **STANFORD**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

**18. EDELSTEIN** was an active participant and a driving force in the unlawful discrimination, harassment, hostile work environment, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff, and aided and abetted same as Plaintiff's supervisor.



# Stanford

## Dan Edelstein

William H. Bonsall Professor of French and Professor, by courtesy, of History and of Political Science

French and Italian

📄 Curriculum Vitae available Online

**19.** At all times relevant, **STANFORD** employed Defendant Ms. ELIZABETH SOROKA (hereinafter referred to as "**SOROKA**"), as a Director of Human Resources. Upon

COMPLAINT

information and belief, **SOROKA** is an individual non-black, non-African American, non-Muslim woman.

**20. SOROKA** held, and still holds, a supervisory position at **STANFORD**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

**21. SOROKA** was an active participant and a driving force in the unlawful discrimination, harassment, hostile work environment, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff, and aided and abetted same as Plaintiff's supervisor.



**22.** At all times relevant, **STANFORD** employed Defendant Ms. PARNA SENGUPTA (hereinafter referred to as "**SENGUPTA**"), as a Professor. Upon information and belief, **SENGUPTA** is an individual non-black, non-African American, non-Muslim woman.

**23. SENGUPTA** held, and still holds, a supervisory position at **STANFORD**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

**24. SENGUPTA** was an active participant and a driving force in the unlawful discrimination, harassment, hostile work environment, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff, and aided and abetted same as Plaintiff's supervisor.

# Stanford



## Parna Sengupta

Director and Associate Vice Provost, Stanford Introductory Studies, Stanford Introductory Studies Operations

25. At all times relevant, **STANFORD** employed Defendant Ms. Jenny S. Martinez (hereinafter referred to as "**MARTINEZ**") as its Provost. Upon information and belief, **MARTINEZ** is an individual non-black, non-African American, non-Muslim woman.

26. **MARTINEZ** held, and still holds, a supervisory position at **STANFORD**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

27. **MARTINEZ** was an active participant in the unlawful discrimination, harassment, hostile work environment, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff, and aided and abetted same as Plaintiff's supervisor.

## Stanford Law School



### Jenny S. Martinez

Provost

Professor of Law

Senior Fellow, by courtesy, Freeman Spogli Institute for International Studies

provost@stanford.edu (mailto:provost@stanford.edu)

Download Curriculum Vitae (https://law.stanford.edu/wp-content/uploads/2015/06/MartinezCV2023.docx-2.pdf)

Stanford Center for Law and History (https://law.stanford.edu/stanford-center-for-law-and-history/)

COMPLAINT

28.   At all times relevant, **STANFORD** employed Defendant Mr. RICHARD SALLER (hereinafter referred to as "**SALLER**"), as its President. Upon information and belief, **SALLER** is an individual non-black, non-African American, non-Muslim man.

29.   **SALLER** held, and still holds, a supervisory position at **STANFORD**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

30.  **SALLER** was an active participant and a driving force in the unlawful discrimination, harassment, hostile work environment, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff, and aided and abetted same as Plaintiff's supervisor.



31.  **FEIGELIS, ANDERSON EDELSTEIN, SOROKA, SENGUPTA, MARTINEZ,** and **SALLER** are hereinafter collectively referred to as the "Individual Defendants".

32.   At all times material, Plaintiff was, and still is, an "employee" of **STANFORD**.

33.   At all times relevant, each of the named Defendants was aware of Plaintiff's race, color, and religion before his wrongful suspension on or about October 11, 2023.

## III.   VENUE AND JURISDICTION

**34.** This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiffs' state law claims. The claims constitute the same case and controversy raised in the claims under federal law.

**35.** The Northern District of California has personal jurisdiction over the Plaintiff because the Plaintiff resides in the State of California in this District.

**36.** Venue is proper in this District pursuant to 28 U.S.C. 1391(b) and 42 U.S.C. 2000e-5(f) because Plaintiff resides in the Northern District of California, and because, upon information and belief, the injuries and effects of unlawful employment practices were experienced in this District.

**37.** Plaintiff duly filed his administrative charge before the California Civil Rights Department ("CCRD") and received his Notice of Right to Sue letter from the CCRD on or about April 1, 2024.



**38.** Plaintiff duly filed his administrative charge before the Equal Employment Opportunity Commission ("EEOC") and received his Notice of Right to Sue letter from the EEOC on or about April 4, 2024.



**39.** Plaintiff satisfied all administrative prerequisites and has filed this case within ninety (90) days of receiving the Notice of Right to Sue letter from the EEOC, and within one (1) year of receiving the Notice of Right to Sue letter from DFEH respectively.

## IV.   FACTUAL ALLEGATIONS

**40.** In or around 2019, **STANFORD** hired Plaintiff as a postdoctoral fellow.

**41.** At all times material, Plaintiff was qualified for his position as postdoctoral fellow at **STANFORD**.

**42. STANFORD** guaranteed Plaintiff's appointment as a postdoctoral fellow for a period of two (2) years, with an optional third year based on performance.

**43.** At all times material, Plaintiff was an exemplary employee who did not disobey orders or directives from his superiors.

**44.** At all times material, Plaintiff performed all duties assigned in a diligent and thorough manner.

**45.** By way of example, Plaintiff's Winter 2020, Worlds of Sound Course Feedback was overwhelmingly positive, with students specifically stating, *inter alia*, that Plaintiff's course

was extremely relatable and engaging, that Plaintiff created a classroom setting that allowed student to fully engage and be part of the discussion, that Plaintiff gave students the freedom to speak their minds and advocate for their viewpoints, that Plaintiff was very responsive to the wants of the students, and that Plaintiff cared not just about teaching the material, but emphasized inspiring his students' interest in the course material:

| 6 - What aspects of this instructor's teaching were most helpful to you? | |
|---|---|
| Ameer Loggins | |
| Response Rate | 12/29 (41.38%) |

- Asking each one of us to contribute and making whatever we said into a discussion topic.; Preparing videos that are relevant to us and engaging, and starting real conversations about the topics brought up in the video.; Leading section as more of a conversation than a lecture, changing the plan in response to our reactions.
- Use of videos and visuals to aid teaching; asking of each students opinion.; Interaction with ideas and centering discussion around our understanding.
- His sections were extremely relatable and engaging, while still remaining relevant to the topic in lecture.; He spoke to us as people and not as his students, which allowed us to become more comfortable in conversation. He also did frequent check-ins with us on how we felt about the overall class.; He was elaborate on answering and questions that we had in terms that we would understand.
- created a classroom setting that was healthily different– allowed everyone to fully engage and be part of the discussion, gave us all the freedom to speak our minds and advocate for our viewpoint; always introduced the other viewpoint, the other side, of what we discussed in lecture – taught me to develop a more critically open, inclusive mindset; created a space where we could have passionate discussion and form unique bonds with our section mates, not just as friends, but as intellectual peers to converse with!
- Allowing open and dynamic discussion; Offered valuable sociopolitical perspectives that made the class topics more interesting and relevant
- Thinking about the politics behind various ideas; Engaging in respectful but lively discussion; Dr. Loggins answered questions in thought-provoking ways.
- Dr. Loggins is authentically and unapologetically himself. That's the most paramount thing I've learned this quarter: to not change who I am just to fit the mold of whatever situation I'm in.; Dr. Loggins made his discussions exciting. He brought up entertaining and interesting topics and sources. He created a space where each of our unique personalities felt welcomed. I didn't feel like I had to deal with the usual 'intelligent jargon' bullshit.; Dr. Loggins is an inspiring human of immense character. I would be honored to be just half as much a man as him. He is human. He treats his students like humans. He's wise and recognizes real when he sees it. He knows true value and he's fair. An Amazing guy honestly. I wish he could teach all of my classes.
- Dr. Loggins was very responsive to the wants of the students and section was a very interactive experience. Prepared lecture material was entirely abandoned and new material would be improvised for our section if Dr. Loggins deemed it fit upon gauging our reaction. Dr. Loggins cared not just about teaching the material but emphasized inspiring interest in us in regards to what was being taught. Dr. Loggins offered fascinating perspectives and ideas on virtually everything we've discussed and conversation with him proves to be very insightful.; NA
- Working to relate to students and talk to us at our level was uplifting and made the course feel less infantilizing.; You brought interesting references and sources that we might not otherwise have come across. They were enriching and I am grateful for them.; You were forgiving and flexible, understanding of our situations and external pressures and willing to work with us to help us satisfy the course requirements.
- Letting the students drive the discussion while still directing it very effectively; Being upfront, honest, and very real with students; Making section and the course fun, enriching the learning
- Expanding the trivial lecture material into interesting discussions.; Raising up arguable question that is worth considering.; Collect and present various sources which are very interesting.
- His incorporation of Black Studies to kind of "balance" the very Eurocentric material covered throughout the course.; He lets us talk. During section discussions, Dr. Loggins would remain silent until one of us spoke.; Sections are very interactive. Dominoes to clapping percussion beats to saying poems over song lyrics.

**46.** By way of example, Plaintiff's Spring 2021, Reading the Body Course Feedback was overwhelmingly positive, with students specifically stating, *inter alia*, that Plaintiff is realistic, honest, and supportive, that Plaintiff demonstrated understanding, kindness, and asked thought-provoking questions, that Plaintiff was authentically thoughtful of student input, and that Plaintiff speaks colloquially, which puts them at ease in a classroom setting:

| 6 - What aspects of this instructor's teaching were most helpful to you? | |
|---|---|
| **Ameer Loggins** | |
| Response Rate | 21/81 (25.93%) |

- Aspect 1: I loved how engaging this section was Aspect 2: I genuinely learned so much in section Aspect 3: I felt challenged and uncomfortable at times, but I think that it was good in helping me grow and expand my knowledge

- 1. He was very engaging 2. He was very upfront (no beating around the bush or pretending something is ok when it very clearly isn't) 3. He cared a lot about our perspectives and individual experiences

- Honest, direct, great communication, kind

- 1. Making the class more of a conversation than a formal class 2. Making students feel comfortable and welcome 3. Keeping it real

- Dr. Loggins is realistic, honest and supportive. Throughout the whole quarter, he showed us that he cared about us and our well-being and not only about how well we did in the class. He is empathetic and understands that being students, coming from different cultures and backgrounds, is extremely stressful. He always advice us to take care of bodies emotionally and physically. His section shone a light among all stressful courses because it was a space where I did not have to pretend to be smart. I could just be myself. Even though I did not talk a lot because I am shy, I would enjoy to go to section, hear our discussions, and learn about aspects that were unknown to me. Dr. Loggins opened my eyes to the many injustices that happen before us and we do not even notice.

- Understanding, Kindness, Thought-provoking questions

- You could tell he really cared to know us as people not just as students. He was so supportive which meant a lot. He's a really good teacher, great at getting people engaged without being forced. I never felt bored when he was teaching. The racial info he brought in as background to the lectures was such a good & important complement

- How he ran the section was super nice because he was very open to what we wanted to talk about and that led to everyone saying some very insightful thoughts. I also liked how he was very respectful of our lives and situations we were in.

- His candidness, his knowledge, and his kindness

- Dr. Loggins' empathy to his students made me feel comfortable sharing personal and sensitive experiences in class and I also liked that he provided supplemental materials from non-European/American viewpoints to better contextualize the material we were getting from the readings and lectures.

- His constant reaffirmation

- Authentic Thoughtful of students input Precise with input

- Aspect 1: His understanding that we are human beings and not just student robots. Aspect 2: He treated us like the adults that we are and not children. Aspect 3: His passion for all of the subjects that we spoke about both in lecture and section.

- His emphasis on really thinking for ourselves. The colloquial speech he encouraged us all to use to make us comfortable speaking in section. Bringing up truly important and relevant topics in section that were very intriguing. This was the best class I took this quarter because of Dr. Loggins.

- 1. Always trying to expand upon the lectures/readings and giving us insight into the deeper meanings behind certain topics/concepts/events 2. Encouraging us to speak and sparking meaningful discussions about certain topics 3. Always receptive and accommodating of other peoples' ideas and contributions to discussions 4. Passionate about teaching

- Realness: Dr.Loggins was always real with everyone in the classroom. He would give his actual opinions and not hold anything back, encouraging students to do the same. Perspective: Dr.Loggins taught the class from the perspective of a person of color which is not something I almost ever see. It was refreshing and I actually learned way more than I have in other classes because I wanted to learn about what was being taught. Most classes have such a limited view, similar to the lecture part of this course (not taught by Loggins), but the section was something new and told the whole story of each subject rather than just looking at one side.

- Caring: He really does show that he cares about his students. Provoking: In the best possible way. He always tries to get you to consider different viewpoints. Listening: He always gives you space and you always feel like he's actively listening and engaging in what you say.

- He brings the stories of people to life. The main lectures often glossed over important people or events, but Loggins always made sure to give such people or events the space they deserved in section. To me this was an important part of section, the fact that I could develop my empathy for others, and really think about what it's like to be in someone else's shoes. He is very welcoming and warmhearted as a person and is one of the most compassionate people I have met. From the first day you can tell that he cares a lot about his students and wishes the best for them and their families. He really wants to see us succeed and I know it made us all the more inspired to go out into the world and do just that. Also, it meant a lot to have a professor who came from a similar background to my own.

- Want for a student's regular voice, rather than their forced work one. Respect toward one's camera being off. Speaking his true opinion on both section-taught topics and lecture-taught topics.

- 1. Dr. Loggins speaks colloquially, which makes me at ease in a classroom setting because I don't have to codeswitch. 2. Dr. Loggins lectures about interesting things. so it makes me WANT to engage and learn more. 3. Dr. Loggins is super understanding and NOT tone-deaf to the real world issues that go on. He treats his students as HUMANS who experience stress, fatigue, and burnout, and doesn't expect us to be Stanford robots that run on two hours of sleep.

- - colloquialness -energy - pedagogy of teaching -kindness -intellect

**47.** By way of another example, Plaintiff's Spring 2022, Reading the Body Course Feedback was overwhelmingly positive, with students specifically stating, *inter alia*, they appreciated the real conversations they had, that Plaintiff was extremely supportive, that Plaintiff was straightforward and blunt in his teaching style, and that Plaintiff was willing to question the canon, which exposed them to valuable information and new thought processes:

COMPLAINT

| 6 - What aspects of this instructor's teaching were most helpful to you? | |
|---|---|
| Ameer Loggins | |
| Response Rate | 23/86 (26.74%) |

• 1. Unapologetic honesty about the shortcomings of lecture and how we might read not just the bodies discussed in lecture, but lecture itself. Who is being represented? How can we talk about this intersectionally rather than one-dimensionally? Where do our personal experiences come in? How do we talk honestly and authenticaly about these experiences in this academic setting? Confronting these questions was the most valuable learning experience of my quarter. 2. Optimizing class time (either for reading during class, visiting the museum, etc.) 3. In addition to having honest, personal discussions, the supplementing of voices that were overlooked in lecture (e.g. that of Roxane Gay's or Lateef's) was a crucial learning experience for me

• so so fantastic

• The real conversations we had. His fearless ability to get at the heart of whatever we're thinking about. Emphasizing that he is someone we can talk to or come to if we need anything at all.

• Providing non Eurocentric perspectives and giving us information on important authors of color that are often glossed over in the big lecture.

• I really appreciated that he always held his own lecture during our section time as I gained much more from those concepts than I felt I did in the larger lecture. Also his passion for sharing and making sure that all the students can digest the concepts we cover allowed me to truly learn a lot from the course.

• Extremely supportive, amazing energy, I feel like I listened so much, wise

• Aspect 1: his compassion Aspect 2: being unapologetic about his believes Aspect 3: adjusting the discussions based on what we wanted to talk about

• Knowledge, inspiration, honest feedback

• I really liked Prof. Loggins's straightforward, blunt teaching style and his willingness to digress from the lecture content.

• The class discussions, the course plans, and the group based teaching style.

• The best professor ever

• Authenticity, clarity, empathy, visualizing of concepts, and use of examples outside of the lecture material while still incorporating them into the section.

• Super willing to question the canon, which brought with it a lot of really valuable information and new thought processes

• His passion, his friendliness, and his incredibly deep knowledge base.

• Ability to empathize with students, getting students to participate in class, designing lectures that augmented the main lectures really well.

• Direct teaching, honest section, creating community

• Kindness, teaching ability, and knowledgeable

• Aspect 1: honesty, Aspect 2: understanding, Aspect 3: encouragement

• Aspect 1: Great speaker when lecturing, extremely engaging Aspect 2: Personable character Aspect 3: Interesting content and discussion in class. Some topics that we talked about were things that I never thought would be brought up.

• Dr. Loggins is an incredible educator and person. He is an incredible academic, deeply knowledgable in all aspects of what I suppose can be best understood as "things related to people", and that understanding is multifaceted, nuanced, and truly inclusive in ways that are rarely seen in and outside of academia. His efforts to center all class discussions on non-Eurocentric views are refreshing, deeply researched, and deeply nuanced. But more so, Dr. Loggins is also just an incredible person. His genuine care and love for every single one of his students in unparalleled, and he truly cares about all of his students and makes them feel loved, all while challenging them to think critically about the world. If you are considering hiring Dr. Loggins for any kind of position, please hire him for it, because he is truly an amazing academic, educator, and person.

• The videos, interviews, and speeches that Dr. Loggins showed to us during section were significantly impactful to our learning at that moment. These videos encapsulated our teachings from lecture and we got an insightful perspective on the world. Another thing he did often was open the table up for discussion if we were up for it. Nothing was ever forced if we didn't want to speak on it. I felt respected.

• 1 - the lectures were great and I always learned so much. I especially appreciated how they addressed all the qualms I had had about the lecture earlier that day, but also picked up on oversights in lecture I hadn't even considered/noticed. He took topics that I wasn't that engaged with in lecture and turned them into a great learning experience and made me see them through a new lens 2 - the cantor revisit was wonderful and I'm really glad we got to go back and see exhibits that were more interesting and matched with the experiences and identities of the students. We had some great discussions while in the museum that made me learn even more. 3 - Dr. Loggins is super caring and considerate of all of his students so that energy was greatly appreciated and really helped improve the classroom experience. I can confidently say that I never have and never will have a teacher like Dr. Loggins, so being in his section was an incredible experience and my favorite part of the class by far. I looked forward to section every Monday and Wednesday!

• I truly appreciated Dr. Loggins being an advocate for his students, particularly during my chaotic, difficult quarter (not to mention one when many of us got COVID). Also, his vulnerability about how topics affected him personally built trust within our section. It felt like everything we learned from him was always quite applicable to our particular contexts.

**48.** By way of another example, Plaintiff's Winter 2022, Citizenship Course Feedback was overwhelmingly positive, with students specifically stating, *inter alia*, they appreciated Plaintiff put a large emphasis on pure discussions rather than quizzing, that Plaintiff was their best professor, that Plaintiff was an excellent professor, and that Plaintiff's Citizenship class was very engaging and interesting:

| 9 - What would you like to say about this course to a student who is considering taking it in the future? All comments are subject to Stanford's Terms of Use for Sites. Answers to this question will be viewable by other students, as well as instructors. | |
|---|---|
| Response Rate | 10/11 (90.91%) |

• This is a wonderful course that really makes you think about what kind of impact you have on your society as well as the impact of society on us.

• This class was very eye opening and overall very interesting.

• this class is really dependent on the professor you get assigned to. My class had Dr. Loggins who put a large emphasis on pure discussions rather than quizzing us on the readings, which I really appreciated.

• I learned so much with Dr. Loggins, probably the best professor I've had so far. Would definitely recommend taking a class with him. Overall, the topic was very interesting.

• Dr. Loggins is a great and engaging professor and made every class feel different and enriching. However, some of the other professors were not as engaging as he was and it sometimes did not feel relevant to my current life.

• This class is a good way to learn more about citizenship, politics, and history in general. It sounds kind of boring but the instruction is good and I ended up broadening my world view.

• Dr. Loggins is an excellent professor. He gives eye-opening lectures and cares deeply about his students. Wish we'd been able to have him the full quarter! FYI the Stanford-chosen readings can be quite dull sometimes.

• This class was very engaging and interesting. It consisted of diverse topics that apply to today's society. Instructor was amazing and understanding!

• Definitely take this course, especially with Dr. Loggins!! For the course itself, I would say that I love philosophy and I've been especially into political philosophy because of this course, but even if it's not your thing already these are ideas worth thinking about. Most of the readings are interesting although VERY time consuming (usually between 30 and 50 pages). I do think this course gave us the chance to engage in good conversations and to think about the state of our society/world today and our role in it. Dr. Loggins is the best!! He is not a normal instructor, he's very passionate about certain things on this case, the othering of people in society, especially blacks), but you have to respect him for it. He cares a lot about his students (even if he doesn't remember your name) and didn't check if you read or anything, he made our classroom a space to disagree (which I did multiple times and didn't feel shunned for it). He swears a lot so be advised haha. But he's great! :)

• HIGHLY RECOMMEND DR. LOGGINS! MOTIVATED SPEAKER, DOWN-TO-EARTH TRULY PASSIONATE ABOUT CHANGE, ORGANIZING, AND EMPOWERMENT TYPE GUY!

| 10 - Would you like to provide any other comments about this course? | |
|---|---|
| Response Rate | 3/11 (27.27%) |

• I was fortunate enough to have Dr. Ameer Loggins as my instructor. More so than any professor I've had, Dr. Ameer makes a point of ensuring that every student's needs are being considered and listened to. He's respectful towards people's ideas that disagree with his own, but doesn't shy away from offering challenging insight to help students critically think about their own beliefs. His knowledge and experience provide him ample insight into real world problems that amplifies his ability to teach effectively.

• none

• Please make it less clearly biased toward the left. I never saw a single conservative-leaning reading. This course should be open to all opinions and to productive discussion and not feel like it was made for a certain group of people.

| Mean of Means Calculations | Mean | School | Department |
|---|---|---|---|
| Mean of Means | 4.28 | 4.25 | 4.17 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**49.** As a result of Plaintiff's excellent performance during his first 2 years, **STANFORD** offered Plaintiff a further two (2) years of employment.

**50.** Beginning on or about August 8, 2023, **STANFORD** hired Plaintiff as a lecturer.

**51.** At all times material, Plaintiff was, and still is, qualified for his position as a lecturer at **STANFORD**.

**52.** However, despite his excellent work record and litany of positive feedback, Plaintiff was forced by **STANFORD** and the individually named Defendants to endure race, color, religion, and political affiliation discrimination at its highest levels.

**53.** Plaintiff asserts that **STANFORD** engaged and continues to engage in a pattern and practice of discrimination against non-white, non-Israeli, non-Jewish and non-Jewish American employees, those critical of the Israeli government, and other protected employees.

**54.** Additionally, **ANDERSON**, **EDELSTEIN**, **SOROKA**, **SENGUPTA**, **SALLER** and **MARTINEZ** are vindictive, racist, Islamophobic, manipulative, controlling, abusive individuals, who continue to exploit their positions of authority to discriminate and retaliate against, humiliate, intimidate, and professionally sabotage **STANFORD** employees, including Plaintiff, due to their race, color, religion, political affiliations, and other protected characteristics.

**55.** It is clear from the severe nature of **ANDERSON**, **EDELSTEIN**, **SOROKA**, **SENGUPTA**'s conduct that they act with the approval of **STANFORD**, and its highest-ranking employees, including **SALLER** and **MARTINEZ** who are aware of and have actively enabled the Individual Defendants' despicable and illegal misconduct.

**56.** In a pattern of discriminatory and retaliatory harassment based on Plaintiff's protected characteristics and protected conduct, **ANDERSON**, **SENGUPTA**, **EDELSTEIN**, **SOROKA**, **SALLER** and **MARTINEZ** have made adverse employment decisions with respect to Plaintiff's job opportunities at **STANFORD**.

**57.** By way of example, on or about October 10, 2023, Plaintiff walked into class with a lesson largely planned around a quote from the reading for the week.

**58.** The said quote was posted by a classroom community member in their reading reflection from Jenny Odell's *How to Do Nothing: Resisting the Attention Economy*, in it. In the selected quote, Odell says, "...I see a...battle playing out for our time, a colonization of the self by capitalist ideas of productivity and efficiency."

**59.** Plaintiff wanted, in praxis, for the students to see their contributions to the class guiding the discussion.

**60.** Plaintiff was also conscious of the fact that just the day before on or about October 9, 2023, the country recognized Indigenous Peoples Day.

**61.** Plaintiff was also conscious of the fact that **STANFORD** sits on the land of the Muwekma Ohlone Tribe, and that this land was, and continues to be, of great importance to the Ohlone people.

**62.** As *caring community members,* Plaintiff felt it necessary to acknowledge the Ohlone people, and to do so Plaintiff felt it necessary to re-introduce settler colonialism into the classroom conversation.

**63.** Plaintiff also wanted to make time and space to have a difficult dialogue about a conversation that was not just taking place on **STANFORD**'s campus but around the world. The conversation surrounded dehumanization, Israel, and Palestine.

**64.** Plaintiff opened by informing the students that he would be touching on a difficult topic, but one Plaintiff felt his students were worthy of discussing.

**65.** Plaintiff also made it clear that he does not condone the loss of innocent lives, and that he does not condone the "slow death" that comes with dehumanization.

COMPLAINT

**66.** Plaintiff proceeded to recite Geneva Article 54–Protection of objects indispensable to the survival of the civilian population which states:

> 1. Starvation of civilians as a method of warfare is prohibited.
>
> 2. It is prohibited to attack, destroy, remove, or render useless objects indispensable to the survival of the civilian population, such as foodstuffs, agricultural areas for the production of foodstuffs, crops, livestock, drinking water installations and supplies and irrigation works, for the specific purpose of denying them for their sustenance value to the civilian population or to the adverse Party, whatever the motive, whether in order to starve out civilians, to cause them to move away, or for any other motive.

**67.** Plaintiff then inserted Geneva Article 54 in conversation with Israeli Defense Minister Yoav Gallent's proclamation that Israel was going to deny Palestinians food, electricity, and fuel, all while calling the Palestinian people "animals."

**68.** Plaintiff informed the classroom that his lecture did not come from the perspective of followers of the Abrahamic faiths of Judaism, Christianity, or Islam.

**69.** Plaintiff informed the classroom that he was not asking the students to pick sides between Israel or Palestine.

**70.** As the dialogue continued, Plaintiff wanted to ensure that students did not conflate the group Hamas with the Palestinian people. Plaintiff wanted the focus to be on Palestinian civilians. Plaintiff also wanted to complicate the ways in which many frame the Israel and Palestine "conflict," which is through the frame of Jewish people vs. Muslim people.

**71.** Plaintiff duly asked whether any Jewish students were present in the classroom, in

COMPLAINT

an effort to speak to diversity within the Jewish diaspora and to demonstrate to the students that the Jewish diaspora is not one with a monolithic politic.

**72.** Plaintiff's intention was categorically *not* to isolate Jewish students.

**73.** Plaintiff referred to the fact that in Israel there are people who identify as Ashkenazi Jews, Sephardic Jews, Mizrahi Jews, and Beta-Israeli Jews, and Zionist Jews, and anti-Zionist Jews.

**74.** Plaintiff additionally pointed out that there were Afro-Palestinians, Muslim Palestinians, Christian Palestinians, and atheist Israelis and Palestinians. Plaintiff wanted to show that neither Israel nor Palestine is populated by a monolithic people.

**75.** As Plaintiff approached mentioning the Jewish Holocaust, he asked if any Jewish student(s) would be uncomfortable with him bringing it up, and the answer was no.

**76.** Plaintiff asked the students, "How many people died during the Holocaust?" As a collective, they all said 6 million people.

**77.** Plaintiff explicitly expressed how unspeakable he finds those genocidal acts of violence.

**78.** Plaintiff then asked the students if they had heard of King Leopold. No one raised their hand.

**79.** Plaintiff then advised the students that King Leopold oversaw the deaths of 10 to 11 million Africans in the Congo.

**80.** Plaintiff reminded the students of the genocide of the Indigenous Americans.

**81.** Plaintiff mentioned the genocidal acts of the British in what is now known as Australia.

**82.** Plaintiff also mentioned Hawaii.

**83.** Plaintiff also mentioned Haiti.

COMPLAINT

**84.** Plaintiff also mentioned Rwanda.

**85.** Plaintiff also mentioned South Africa.

**86.** Plaintiff ensured to mention all of these groups in recognition of the rich diversity which makes up **STANFORD**'s student body.

**87.** In returning to the reading for the week, Plaintiff intended to implement a "scripted space."[1]

**88.** In two different sections, Plaintiff used 2 students as part of the classroom exercise to create a scene within a scripted space.

**89.** Before asking the two students (one white/Jewish male and one woman of Asian descent), in separate classes, on the same day, Plaintiff requested their permission to be a part of the exercise he was about to perform.

**90.** Plaintiff did not select the students using any other criteria than the seats that they occupied in the classroom, and their physical size to illustrate a power differential between the large and the small, the oppressed and the oppressor.

**91.** Once the students agreed, Plaintiff began taking their backpacks, and computers. Plaintiff then asked them to stand as he moved the chairs in which they were seated.

**92.** Policing the students, Plaintiff then asked them to face the window.

**93.** Finally, Plaintiff told the students they could come from facing the window if they could produce identification.

**94.** The purpose was to do an exercise on profiling and policing within a scripted space.

**95.** Plaintiff asserts that Gaza, as Human Rights Watch calls the largest open-air prison

---

[1]According to Odell, a 'scripted space'...is a space that excludes, directs, supervises, constructs, and orchestrates use. Anyone who has ever tried any funny business in a faux public space knows that such spaces do not just script actions, they police them. In a public space, ideally, you are a citizen with agency, in a faux public space you are either a consumer or a threat to the design of the place.

COMPLAINT

in the world, is an extreme version of a scripted space.

96. Once the exercise was over, Plaintiff thanked the students for their participation, and continued with his lecture.

97. Plaintiff then pivoted to recalling a story told by a Palestinian civilian, Mr. Refaat Alareer (hereinafter referred to as "Mr. Alareer") as the chilling sound of bombs burst in the background. Of all of the accounts circulating on social media, Plaintiff chose Mr. Alareer's, because he is a college professor. Mr. Alareer is someone Plaintiff felt that both the students and Plaintiff himself could relate to as an academic who is teaching at a university, given he too saw education as a path to fulfillment and stability.

98. While holding a whiteboard marker in his hand, Plaintiff quoted Mr. Alareer saying, "I am an academic, probably the toughest thing I have in my house is an Expo Marker…but if they invade and go door to door to massacre us, I'm going to use this Expo Marker to throw at the Israeli Soldiers. Even if it is the last thing that I will be able to do."

99. Plaintiff then returned to his opening question, again asking, "do you think that right now, Palestinian civilians are living a good life?"

100. Plaintiff ended the lecture on a note, surrounding Odell's ideas on a "colonization of the self by capitalist ideas of productivity and efficiency" and how it applies to the student-self, in circling back to the reading and the students' lived experiences, as a reminder that this very lecture comes largely from the text THEY put on the syllabus for Plaintiff to teach the students.

101. On or about October 11 that same day, **EDELSTEIN**, **SOROKA**, and **SENGUPTA** unreasonably and unjustifiably subjected Plaintiff to a barrage of pretextual allegations, including that Plaintiff was antisemitic by virtue of that day's lecture.

102. Additionally, **EDELSTEIN**, **SOROKA**, and **SENGUPTA** unreasonably and unjustifiably subjected Plaintiff to a pretextual investigation, with **STANFORD**'s approval.

**103.** This allegation was, and still is, categorically false; Plaintiff is categorically *not* antisemitic.

**104.** Plaintiff was extremely shocked, hurt, and taken aback by these allegations and offended by this discriminatory investigation.

**105.** Plaintiff immediately engaged in protected activity by vehemently objecting to and denying these clearly false allegations and pretextual investigation. Plaintiff provided a detailed explanation of his intentions with his lecture, establishing that there was nothing antisemitic about it whatsoever.

**106.** Despite Plaintiff's explanation and denials, **EDELSTEIN**, **SOROKA**, and **SENGUPTA** subjected Plaintiff to an unjustifiable and unreasonable disciplinary suspension with pay, with **STANFORD**'s approval.

**107.** Given the temporal proximity between Plaintiff's protected conduct in objecting to Defendants' pretextual, discriminatory investigation, **STANFORD**'s adverse employment decision to suspend his employment with pay is clearly retaliatory.

**108.** Additionally, **STANFORD**'s adverse employment decision to suspend Plaintiff's employment is discriminatory, given they do not treat similarly-situated non-black, non-African American, non-Muslim employees in the same manner.

**109.** **EDELSTEIN**, **SOROKA**, and **SENGUPTA**'s actions in this regard were clearly discriminatory as non-black, non-African American, non-Muslim employees were not subjected to such vile, despicable, and clearly false allegations of workplace antisemitism or unjustifiable, unreasonable suspensions.

**110.** **EDELSTEIN**, **SOROKA**, and **SENGUPTA**'s actions in this regard had the purpose and effect of subjecting Plaintiff to intimidation and humiliation in the workplace, thereby

1
2
negatively impacting his ability to perform his job and severely, negatively altering his work environment and the terms and conditions of Plaintiff's employment at **STANFORD**.

3
4
   **111.** Despite Plaintiff's complaint, **STANFORD** took no immediate or effectively remedial corrective action and, consequently, perpetuated the toxic environment.

5
6
7
8
9
   **112.** By way of example, on or about October 11, 2023, **SALLER** and **MARTINEZ** released a defamatory, discriminatory statement, which was picked up worldwide and had the purpose and effect of publicizing **STANFORD**'s discriminatory decision to suspend Plaintiff's employment, thereby demonizing and scandalizing Plaintiff before the world.

10
11
12
   **113.** **SALLER** and **MARTINEZ**'s actions in this regard were discriminatory and retaliatory, given the temporal proximity to Plaintiff's protected conduct, and because they do not treat non-black, non-African American, and non-Muslim employees in this manner.

13
14
15
16
   **114.** The statement confirmed that there was a personnel action being taken against Plaintiff, that the investigation was being done because the allegations if true could be considered illegal acts and that the alleged behavior at issue was serious.

17
18
19
20
   **115.** While Plaintiff's name was not in the statement, **SALLER** and **MARTINEZ** were both aware that by confirming that **STANFORD** had suspended a "Lecturer" and that the "Lecturer" was under investigation for serious and potentially illegal conduct, that it would enable the media to report Complaint's name as the involved lecturer.

21
22
23
   **116.** **STANFORD, SALLER** and **MARTINEZ** do not publicly confirm personnel actions taken against Caucasian, Jewish and non-Muslim employees.

24
25
26
27
   **117.** **STANFORD, SALLER** and **MARTINEZ** do not launch and/or confirm investigations into the conduct of non-African American, non-Muslim, professors, lecturers, and other academics for pretextual reasons including for critically analyzing the policies of foreign governments other than Israel.

28

COMPLAINT

**118.** For example, **STANFORD, SALLER** and **MARTINEZ** did not sanction the investigation into potential illegal conduct by Mr. Allan Jospeh Bankman ("**BANKMAN**"), upon information and belief a non-Muslim, Caucasian and/or Jewish Professor in the **STANFORD** Law School, in connection with millions of dollars he allegedly, illegally donated to **STANFORD**.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., FTX TRADING LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES INC. (d/b/a FTX.US), | Adv. Pro. 23-_____ (JTD) |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| ALLAN JOSEPH BANKMAN and BARBARA FRIED, | |
| Defendants. | |

**119.** Specifically, **BANKMAN** was sued by FTX, a company his convicted son ran as a family business with **BANKMAN**'s assistance.

**120.** In the FTX suit, **BANKMAN** was alleged to have engaged in fraudulent and illegal conduct associated with 5.5 Million dollars of donations to **STANFORD.**

**121.** Despite the obvious connection to **STANFORD** and the potential negative ramifications of **BANKMAN**'s allegedly illegal actions on **STANFORD**, **STALLER** and **MARTINEZ** did not sanction an investigation into his conduct.

**COMPLAINT**

**122.** Likewise, in the FTX suit, **BANKMAN** allegedly illegally and fraudulently funded an all-expenses paid trip for a **STANFORD** law student to attend a Formula One event in France.  This law student later became an employee of FTX.

**123. STANFORD, SALLER** and **MARTINEZ** did not launch an investigation into **BANKMAN**'s allegedly illegal conduct notwithstanding the direct connection to a student.

**124.** Moreover, **STANFORD, SALLER** and **MARTINEZ** did not make a statement to the press about **BANKMAN,** nor did they suspend him pending an investigation despite the allegations of illegal conduct in connection with his student interactions and fundraising activities for **STANFORD**.

**125. BANKMAN** is still an active member of the teaching faculty.

**126.** Similarly, **STANFORD, SALLER and MARTINEZ** specifically refused to comment to the media when asked by the media about **BANKMAN** in sharp contrast to Plaintiff.

**127.** Specifically, when asked about **BANKMAN** by the media, **STANFORD, SALLER** and **MARTINEZ,** through a spokesperson, Ms. Stephanie Ashe, stated "**as a matter of policy, Stanford University and the law school do not take positions on the outside activities of our individual faculty members, nor do we discuss personnel issues or other confidential matters**."[2]

**128.** Proving that **STANFORD**, **SALLER** and **MARTINEZ** discriminated and retaliated against Plaintiff was thus made clear when it refused to discuss **BANKMAN's** issues publicly, but violated the stated policy of not discussing personnel matters publicly when it came to Plaintiff.

**129. BANKMAN** is not Muslim, or African American. Plaintiff Dr. Loggins is African American and a Muslim.

---

[2] Stanford Daily, August 13, 2023, "SBF is leaving campus. But Stanford's ties to his case are deeper than previously known."

130.  **BANKMAN**, upon information and belief, is Caucasian and/or Jewish.  Plaintiff, Dr. Loggins is not.

131. Starting on or about October 12, 2023, in the wake of **STANFORD**'s discriminatory and retaliatory suspension, its student body responded with an abundance of support, including a petition on Plaintiff's behalf.

**From:** Andrew Thomas Grant████████@stanford.edu>
**Sent:** Wednesday, October 11, 2023 5:23 PM
**To:** Ameer Hasan Loggins████████@stanford.edu>
**Subject:** College 101 Different Instructor

Hello Dr. Loggins,
I just got an email about you not teaching my COLLEGE 101 class tomorrow. I am very sad to see that. I hope that this is only temporary, as I felt that you were one of the best teachers I've ever had, even though I've only had you for three weeks. Anyway, I just wanted to say that you have already impacted me and my thinking a lot, and I felt like your discussions were always very respectful and eye-opening. Coming from a Jewish background, I felt very respected as you talked about the conflict in Israel, and you confirmed with me during class if I was comfortable talking about sensitive topics relating to the matter. I did not feel any negativity or hostility even though you might not share the same opinion as me, and I thought it was great that we were able to talk about important topics such as those during class to educate those who might not know. I think it would be a great disservice to Stanford if they lost you as a member of the teaching staff, and most importantly I hope that you and your family are doing well. Thanks for all that you have done, everyone I know in your class feels the same way I do.
Sincerely,
Andrew Grant (Section 42)


**From:** Jacob Alan Rubenstein████████@stanford.edu>
**Sent:** Saturday, October 7, 2023 9:02 PM
**To:** Ameer Hasan Loggins████████@stanford.edu>
**Subject:** Quick Talk

Hi Ameer,
I was wondering if you would be free to have a quick talk with me about Israel and Palestine somewhat soon. I have a lot of thoughts and have had one or two not great conversations with friends and family. I would be ok with a zoom meeting too of course if that is easier for you.

Thank you so much!

Jacob Rubenstein

COMPLAINT

**From:** Liberty R Walton <▓▓▓@stanford.edu>
**Sent:** Tuesday, October 31, 2023 2:28:10 PM
**To:** Ameer Hasan Loggins ▓▓▓@stanford.edu>
**Subject:** I support you

Hey Prof Loggins,

You're probably gonna get a lot of nastiness coming your way because of the daily articles if you haven't already so I just wanted to say I'm in your corner. I still remember kindness you showed me a couple years ago in THINK, and I know you're a good guy with good politics. Maybe the classroom demonstration wasn't done in the most unproblematic of ways but I do think making people uncomfortable isn't always a fundamentally bad thing, especially in a time like this. I hope you're doing alright and your position isn't in jeopardy because of it although we both know what's happening to Palestinian allies right now. Hang in there, you know what's right

Liberty Walton

...

[Message clipped]  [View entire message](#)

**Loran Baxter Mercado** ▓▓▓ @stanford.edu>                    Fri, Nov 3,
                                                                3:51 PM

to Ameer, me

Hi Dr. Loggins,

This is Loran Baxter Mercado from Stanford College 101 and 103, last year. I don't know why exactly I'm writing, and I don't want to waste your time, but I wanted to tell you that a few days ago I had a dream you were in. I don't remember the details, but I ended up looking you up and finding that you were still teaching at Stanford, along with a bunch of news articles featuring your name. I read many but know very well—especially from our class—not to trust everything I read.

I just wanted to reach out and not only express my gratitude for your being the best teacher I've had here, but also offer to help with anything. Even last year, it was obvious how easily misconstrued some concepts and methods you used to teach could be—but that the spirit and intention behind what you teach is not only pure, but necessary for meaningful discussion.

In the little time we've known each other, you've had a profound impact on how I view the world and myself within it. Please let me know if there's anything I can do to pay that back or forward in any marginal way—if you need anything at all. You're an incredible teacher. I know I'm not telling you anything you don't know, but I hope you recognize just how grateful your students are.

**From:** Gabriella Safran ▓▓▓@stanford.edu>
**Sent:** Friday, October 20, 2023 12:08 PM
**To:** Ameer Hasan Loggins <▓▓▓@stanford.edu>
**Subject:** sympathy

Dear Ameer,
I've been reading about what happened in your class and feeling for you. I know that an investigation is underway now and I don't want to get in the way of that, but I wanted to reach out and offer to chat once it's over, as I hope it will be soon. I am sure this is a hard time for you and I am thinking of you.
take care,
Gabriella

Gabriella Safran
Senior Associate Dean of Humanities and Arts
Eva Chernov Lokey Professor in Jewish Studies
Professor of Slavic Languages and Literatures
Stanford University
Stanford, CA 94305

COMPLAINT

**Student Testimony**

"The allegations against Dr. Loggins are based on statements from students who were not present during the class in question. They entirely misrepresented what happened in order to stretch a false and dangerous narrative that criticizing colonialism in Israel and calling out deniers is anti-semitic. Now more than ever we need Professors like Dr. Loggins who care about students and creating space for tough conversations."

**Student Testimony**

"I remember the first day I walked into Dr. Loggins' class, not knowing what to expect. It was a simple discussion section, and yet, as I engaged in the discussions, I felt like I was uncovering hidden facets of my identity and confronting aspects of myself that had long been veiled. Dr. Loggins, to me, is a person who deeply cares. His care goes beyond the academic realm; it makes you more aware of the intricate components that shape your life, your identity, and the impact you want to leave in this world. This kind of care is something I would only expect from a loving father, but in Dr. Loggins' case, his family extended to his students in the classroom."



**SIGN THE PETITION TO REINSTATE DR. LOGGINS immediately.**



**SIGN THE PETITION TO REINSTATE DR. LOGGINS immediately.**

# JUSTICE FOR DR. LOGGINS

ON OCTOBER 11, BLACK, MUSLIM LECTURER, DR. AMEER HASAN LOGGINS, WAS UNJUSTLY SUSPENDED AFTER A FALSE STATEMENT ACCUSED HIM OF ANTISEMITISM.

**We, Stanford University undergraduate students, call for Dr. Loggins to be reinstated immediately.**

**What happened...**

On October 11, the co-presidents of Stanford's Student Israel Association (SIA) conducted an interview with the SF Chronicle, claiming that Dr. Loggins, who teaches the required freshman civics course College 101, subjected Jewish students in class to unfair treatment and Islamophobia about current events in Israel/Palestine.

The claim centers a false narrative of asking Jewish students to publicly declare their Jewish identity, physically separating them from their belongings as a way of "simulating what Jews were doing to Palestinians," before harshly and unfairly questioning them. Simply put, this is not what happened. Neither student interviewed was in the class in question and all other cited accounts of the situation deny that Dr. Loggins was in any way anti-semitic.

Dr. Loggins' October 10th lecture centered on colonialism and state violence, relating the course to the current Israeli Palestinian conflict as well as other struggles. He sought to contextualize the discussion with lived student experience, providing sensitivity and trigger warnings rather than singling any students. This was with deliberate care and consideration before Dr. Loggins addressed the Holocaust, asking for consent to proceed.

This is all contrary to the false claims that Loggins demanded Jewish students stand up, confiscated their phones, and told them to face the wall. He instead conducted an exercise involving consenting volunteers, regardless of their religious affiliation, asking not just for consent but active participants.

The exercise aimed to engage humanistic perspectives on the Palestinian crisis, and to emphasize that in the face of oppression, doing nothing is a privilege. The accusation that Loggins relied at Jewish students and branded them as colonizers is entirely unfounded. In reality, Loggins engaged students of all identities in valuable discussions, regarding their family origins, fostering connections to global colonial relationships. When the false claims began breaking news, Dr. Loggins was put on immediate leave and banned from stepping foot on campus. Since students in and out of his classes have been speaking out to demand this unfair action be rectified and Dr. Loggins be reinstated.



**SIGN THE PETITION TO REINSTATE DR. LOGGINS**

COMPLAINT

**Claim 1**

Loggins demanded Jewish students to stand up, took their phones told them to face the wall/sit in the corner.

**Claim 2**

Dr. Loggins was "singling out" Jewish students.

**Claim 3**

Loggins went down the line yelling at Jewish students, branding them as colonizers.

**What Actually Occurred:**

In both of his sections, he asked for a consenting volunteer to participate in an exercise that is meant to answer the first of his guiding questions. From a humanistic perspective, do you believe that Palestinians are living a good life right now? The class section is called Why College? Education and the Good Life. This said, Loggins was able to connect this exercise to the theme of the class he teaches, as well as connect it to multiple conversations they have had previously about what are the things necessary for a good life. Within the exercise, Dr. Loggins led the volunteer through a series of orders such as "Stand up," "Give me your phone," and "Stand by the wall." Mind you, this was all merely an exercise, and it was clear to all parties involved that these were NOT real orders. At the end of the brief exercise, he then told the class how this is just some of the constant police questioning and brutality Palestinians face on a daily basis. The student participant in the first section was a Jewish boy, while in the next section, it was a Burmese girl. To reiterate, the exercise was done in both of his sections, to volunteers, irrespective of their religious affiliation. This is made evident by the fact that these two students were sitting in the exact same seat in his classroom. Thus, the sole motivator for whom he selected was based on the seat they were sitting in and the amount of space they'd have to be able to participate.

**What Actually Occurred:**

There were two instances in which Dr. Loggins explicitly addressed the Jewish students of the classroom, one of which happened in the first section and the second in the subsequent section. At the beginning of the first section, Loggins asked if people knew anything about the conflict. After seeing that almost everyone did not know, he asked if there were any Jewish students in the classroom. There were two Jewish identifying students in the classroom at the time. He then extended an invitation to these students to share their perspectives on the issue, to which they replied that they didn't have many substantive things to say due to their lack of knowledge. After this, he moved to a discussion on how regardless, it is important to recognize the diversity that can be seen within the Jewish diaspora. He mentioned how there are "Sephardic Jews, Ashkenazi Jews, Mizrahi Jews, Beta Israel Jews, Hasidic Jews, Secular Judaism, Orthodox Judaism," etc. He emphasized how in the same way that Black thought does not exist as a monolith, nor does Jewish thought. After this point was made, Loggins did not make any reference to particular Jewish students. The second instance where Loggins explicitly referenced Jewish students was in the second. This time, he was leading a discussion on the many atrocities that have occurred during the world's history that have led to the mass dehumanization of marginalized communities. As he was moving to include the Holocaust among these atrocities, he hesitated and first asked if there were any Jewish-identifying students in the classroom. He did this as a way to provide a trigger warning for Jewish students in the classroom who may be sensitive to the topic. There was one Jewish student in this section. Loggins then asked the student if he was okay with discussing the Holocaust, and the student answered Loggins that he was okay with it. After this question was asked, Loggins did not make any reference to particular Jewish students.

**What Actually Occurred:**

Dr. Loggins aims to always make his lecturers as relatable as possible. As opposed to reading from a textbook, he asks students questions about their own lives to keep them engaged and develop personal relationships. With this being said, Loggins asked different students where their families were from. For example, when a Haitian student replied saying where they were from, Loggins replied by saying "Okay, and Haiti was colonized by the French." Another student replied and said they were from the United States, and he said "Okay, and the United States is a colonizing state. Another Filipino student replied and he said "Okay and the Philippines was colonized by Spain". He repeated this exercise with those willing to share, offering their own origins. Some of the others would include Mexico being colonized by Spain, and the UK operating as a colonizing state. What is crucial to understand is what Loggins would do immediately following this. He would follow this up by connecting the information that students shared to a quote from Jenny Odell's How to Do Nothing: Resisting the Attention Economy. For context, this was a reading that was included in the course syllabus and Chapter 1 was assigned for the class: "Currently, I see a similar battle playing out for our time, a colonization of the self by capitalist ideas of productivity and efficiency." (pg. 74). Loggins made the point that despite the overwhelming presence of 'colonizer'-to-'colonized' relationships within our world, this pervasive narrative need not seep its way into our psyche as individuals. In other words, Loggins made clear that our global colonial relationships 1. do not represent us individually and 2. should compel each of us to decolonize ourselves.



SIGN THE PETITION TO REINSTATE DR. LOGGINS immediately.

132. However, as a direct consequence of **STANFORD**'s misconduct, including their decision to publicly demonize Plaintiff, a torrent of hateful individuals subjected, and continue to subject, Plaintiff to unjustifiable, despicable messages due to his protected characteristics and activity.

133. **STANFORD**'s, **SALLER**'s and **MARTINEZ'**s failure to take immediate, appropriate corrective action in response is clearly both retaliatory and discriminatory, given the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

temporal proximity to Plaintiff's protected conduct, and that similarly-situated non-black, non-African American, and non-Muslim faculty, like **BANKMAN** and others are not publicly humiliated and/or publicly suspended.

134. The failure to take immediate and effectively remedial action embolden other **STANFORD** students and/or employees including, *inter alia*, **FEIGELIS**, as well as individuals not currently students or employees of **STANFORD** to openly criticize, and spew venomous hate mail, and outright lies about Plaintiff.

From: ben nathan <richedanscingans@gmail.com>
Sent: Thursday, October 12, 2023 6:19 PM
To: Ameer Hasan Loggins ████ @stanford.edu>
Subject: Free Israel

Hi Ameer,

Your actions have not gone unheard of. Isolating a group of Jewish students after seeing the horrific actions from Hamas.

We will make you lose your job and it does not end there. We have your details and we will find you.

Sleep with one eye open.

Kisses from Israel!

From: Katarzyna May <katarzynamayofficial@gmail.com>
Sent: Friday, October 13, 2023 5:43 AM
To: Ameer Hasan Loggins ████ @stanford.edu>
Subject: Dream Research. That sounds about right.

Hey Ameer

I just wanted to ask you about some dream research I've been doing. It's easy for me to sleep knowing this one thing… but the real question is; will it be for you?

Will it be easy for you to dream that you're not going to end up hanging from a tree you fucking nigger piece of shit?

Will it be easy for you to dream of sleeping easy again?

Will it be easy for you to dream of not going to jail?

Will it be easy for you to dream of being safe at night?

Let me know

Nigger.
…

**From:** Weed Zen <zenweedofficial@gmail.com>
**Sent:** Friday, October 13, 2023 5:49 AM
**To:** Ameer Hasan Loggins ███████@stanford.edu>
**Subject:** ameer76@stanford.edu

Greetings Ameer!

I was wondering how you were doing?

have you had any dreams of hanging from a tree like a total fucking nigger lately? I



hope not

**From:** Sean Spring <canes527@icloud.com>
**Sent:** Friday, October 13, 2023 11:12 AM
**To:** Ameer Hasan Loggins ███████@stanford.edu>
**Subject:** Die

I would fucking kill you if you were near me. You fucking nasty human fucking nigger. Only 6 million Jews died? That's it? Well my whole family died in the ovens you fucking sand nigger!!! would cook your ass at a low 250 so you burn slow!! Your meat falling off the bone bitch. I prey to god above you suffer a nasty life and then burn in hell with your people.. btw how the fuck is an ignorant sand nigger a teacher at Stanford? What a fucking disgrace you are! Please die a long slow death. God please make this scum suffer
Sent from my iPhone

y <goatcokray@yahoo.com>
**Sent:** Friday, October 13, 2023 1:09 PM
**To:** Ameer Hasan Loggins ███████@stanford.edu>
**Subject:** [SPAM:###] Palestine

Do you support baby killers you dirty ugly nigger?!

**From:** Floyd Cokray <goatcokray@yahoo.com>
**Sent:** Friday, October 13, 2023 1:28 PM
**To:** Ameer Hasan Loggins ███████@stanford.edu>
**Subject:** Re: Palestine

You dirty ruthless worthless disgusting baby killer! You are one ugly fucking worthless nigger!

**From:** dust71 <dust71@gmail.com>
**Sent:** Saturday, October 14, 2023 6:12 PM
**To:** Ameer Hasan Loggins <████@stanford.edu>
**Subject:** Hamas is a terror group

For someone that has a degree from a college
you are an idiot.  To degrade grown people and have them
go stand in a corner.  Who the hell do you think you are?

To state hamas is not a terror group, but freedom fighters
is just fricking crazy.  Freedom fighters dont kill women & children.
Only terrorist losers do that crap like ISIS.  If you think hamas is so great
why don't you move to the gaza strip and join them.

You won't do that, because you are a coward.  You would be dead
in a day and I for one would gladly celebrate when that would happen.
All you want to do is spew crap and support losers like them.
What does that say about you.

You will lose your job now and noone will hire your dumbass.
Watch your back now.  You will be on many radars.  Good job jackass.
Learn how to keep your mouth SHUT because now someone will SHUT
it for you.

**From:** Sari <sarivine@yahoo.com>
**Sent:** Sunday, October 15, 2023 5:16 AM
**To:** Ameer Hasan Loggins ████@stanford.edu>
**Subject:** [SPAM:##] I hope you

I hope you have the same type of death as any of the Jews from the holocaust or from last
week.

**From:** Chase Robbins <chaserobbins80@gmail.com>
**Sent:** Sunday, October 15, 2023 5:31 AM
**To:** Ameer Hasan Loggins ████@stanford.edu>
**Subject:** Ameer = Anti BLM

You have shown your true colors. Black. Like Isis. There is a reason you were born all
darkish and brownish and blackish, so you can show your true "shit" like looking colors.
You are no scholar lol. You are just another black useless man. Go to Chicago where
it's a great chance one of your fellow animals can shoot your ugly face off. You are a
lecturer no more.

COMPLAINT

1
2

**From:** JessePurdue@proton.me <JessePurdue@proton.me>
**Sent:** Friday, October 13, 2023 2:30 PM
**To:** Ameer Hasan Loggins < ████ @stanford.edu>
**Subject:** Here's to hoping...

3
4

I am praying your family is slowly killed in front of you. The world hates muslims and niggers. Soon, you inferior humans will be eliminated in full. Mohammed was no prophet. He was the rapist of small boys.

5
6
7

**From:** MisinformationWatch <MisinformationWatch@proton.me>
**Sent:** Friday, October 13, 2023 6:51 PM
**To:** Ameer Hasan Loggins ████ @stanford.edu>
**Subject:** Watch your back, nazi

8

Leave the Bay Area and never come back. You are neither safe nor welcome here, nazi boy piece o shit

9
10
11

**From:** TF Bowen <flyfast2u@aol.com>
**Sent:** Friday, October 13, 2023 7:29 PM
**To:** Ameer Hasan Loggins ████ @stanford.edu>
**Subject:** Coming for you

12

They are coming for you

13

You should hide

14

You might not be here for long

15
16
17

**From:** Dan B <1849dan@gmail.com>
**Sent:** Saturday, October 14, 2023 6:21 AM
**To:** Ameer Hasan Loggins < ████ @stanford.edu>
**Subject:** Re: You're a

18
19

YOU are a racist. YOU are a colonizer. I'm going to make it my mission to make sure any future company or institution that unknowingly employs you will know exactly what you are.

20

On Friday, October 13, 2023, Dan B <1849dan@gmail.com> wrote:
Pro terrorist piece of shit and I hope you never find work again.

21

...

22

[Message clipped]  View entire message

23
24
25
26
27
28

COMPLAINT

**From:** Chase Robbins <chaserobbins80@gmail.com>
**Sent:** Sunday, October 15, 2023 5:26 AM
**To:** Ameer Hasan Loggins ███████ @stanford.edu>
**Subject:** Ameer vs. Jews and Blm

Hi Uhmeer

Do you even know your own fathers name?
Or paternal grandfather?
Don't lecture Jews about our history when you can't name even one of your prostitute parents.
You ugly loser.

**From:** Peter Monsaas <pwmonsaas@gmail.com>
**Sent:** Sunday, October 15, 2023 1:58 PM
**To:** Ameer Hasan Loggins < ██████ @stanford.edu>
**Subject:** You are a worthless human

I hope you suffer the same fate as the raped and dismembered babies

**From:** yg54789@proton.me <yg54789@proton.me>
**Sent:** Monday, October 16, 2023 5:26 AM
**To:** Ameer Hasan Loggins < ██████ @stanford.edu>
**Subject:** Sick MoFo

I wish those Jewish students you belittled would break into your home, and in front of you, behead your children, rape and kill your wife, and then torture and kill you. But guess what? They won't. They are not animals like you and Hamas are.

Sent with Proton Mail secure email.

**From:** antijihadi101 <antijihadi101@proton.me>
**Sent:** Monday, October 16, 2023 1:43 AM
**To:** Ameer Hasan Loggins ███████ @stanford.edu>
**Subject:** Watch your back

Listen you pedophile worshipping goat fucking sand nigger, i know your face, im in the area, you ever come across my path, i'll gut you like the dog you are you muslim scum.

Sent with Proton Mail secure email.

135. As a direct result of **STANFORD**'s, **SALLER**'s and **MARTINEZ**'s discriminatory and retaliatory actions, Plaintiff has been subjected to a campaign of racial and religious harassment that is unrelenting.

136. On or about October 24, 2023, Plaintiff took further protected action by retaining a law firm to protect and enforce his rights under the anti-discrimination laws.

COMPLAINT

137. **STANFORD, SALLER, MARTINEZ** and the other named defendants have engaged, and continue to engage, in a pattern and practice of discrimination against black, African American, Muslim non-Israeli, non-Jewish, and non-Jewish American employees, and other protected employees.

138. The totality of these acts demonstrates a pattern of discrimination intentionally perpetrated by **STANFORD** and its leadership against Plaintiff to illegally reduce its work force and/or illegally terminate various employees and create an intimidating, hostile and offensive work environment in violation of Federal laws, and California State laws, local statutes, codes, and ordinances.

139. **STANFORD** created a culture whereby students, employees, management, and supervisors felt comfortable openly harassing, discriminating against, retaliating against, and defaming black, African American, and Muslim employees, and employees who are critical of the Israeli government, including Plaintiff.

140. By way of example, on or about March 1, 2024, in addressing a bipartisan roundtable hosted by the House Committee on Education and the Workforce **FEIGELIS**, a **STANFORD** student, employee and educator, defamed and slandered Plaintiff by unfairly, unjustifiably, unreasonably, untruthfully, and inaccurately subjecting him to the public mischaracterization as one of two of "**STANFORD**'s most racist faculty member[s]."

\*\*\*

Beyond students organizations, Feigelis also criticized faculty responses to the Israel-Gaza war. Specifically, Feigelis characterized Palumbo-Liu and Ameer Loggins, a former instructor of COLLEGE 101 who was suspended (https://stanforddaily.com/2023/10/18/stanford-suspended-a-lecturer-for-identity-based-targeting-heres-what-students-say-happened/) following reports of identity-based targeting as "Stanford's most racist faculty members."

[3]

---

[3]   The   Stanford   Daily,   "Ph.D.   student   testifies   before   Congress   on   antisemitism   at   Stanford",   available   at

COMPLAINT

141.   Plaintiff is categorically not racist, making **FEIGELIS'** statement a defamatory, slanderous, and libelous mischaracterization of the Plaintiff.

142.   **FEIGELIS** published this false mischaracterization with the purpose and intended effect of further retaliating and discriminating against Dr. Loggins all with **STANFORD**'s implicit consent since Standford had taken no action to remedy the hostile work environment it created surrounding Plaintiff's suspension.

143.   This is especially true because **FEIGELIS** was not in Dr. Loggins' classroom when he gave his lectures, nor was he part of the investigation into the lectures and he had no firsthand knowledge of what occurred in the classes that were at issue.

144.   As an employee of **STANFORD**, **FEIGELIS** not only defamed Dr. Loggins, but he also failed to follow the rules and regulations of the school which prohibit commenting on personnel matters which are private and confidential.

145.   **STANFORD** failed to train **FEIGELIS** regarding the private and confidential nature of employee personnel matters and **STANFORD, SALLER,** and **MARTINEZ's** own statement to the press revealing its decision to suspend Plaintiff based on an investigation into potential illegal conduct gave **FEIGELIS** the belief that he could say anything he wanted publicly about Dr. Loggins without repercussion.

146.  The defamatory statement clearly cast Plaintiff into a bad light and caused ridicule, scorn, and economic injury to Plaintiff by harming his professional reputation and employability generally and as a lecturer.

147.   During the bipartisan roundtable hosted by the House Committee on Education and the Workforce **FEIGELIS** slandered and libeled Plaintiff by publishing an image and falsely claiming that "just after the attacks of October 7th, Stanford Lecturer Ameer Loggins segregated

https://stanforddaily.com/2024/03/07/ph-d-student-testifies-before-congress-on-antisemitism-at-stanford/, accessed March 12, 2024

Jews in his classroom" that Plaintiff "proceeded to publicly shame these Stanford students...Ameer called these students "colonizers" and stated that Hamas is not a terrorist organization, but a group of legitimate freedom fighters" and that Plaintiff "Stated that Hamas represents the Palestinian people and what Hamas is doing is 100% legitimate."

- ■ Palumbo-Liu is also one of the leaders of Stanford's Faculty for Justice Palestine (FJP).



- ○ Ameer Loggins
  - ■ In early October, just after the attacks of October 7th, Stanford Lecturer Ameer Loggins segregated Jews in his classroom.



[4]Committee on Education & the Workforce, "Kevin Feigelis Testimony", available at https://edworkforce.house.gov/uploadedfiles/kevin_feigelis_testimony.pdf, accessed March 12, 2024

Page 35

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

148. Plaintiff categorically did not segregate Jews in his classroom. Plaintiff categorically did not publicly shame the Jewish Stanford students or call these students "colonizers." Plaintiff categorically did not state that "Hamas is not a terrorist organization, but a group of legitimate freedom fighters," or that "Hamas represents the Palestinian people and what Hamas is doing is 100% legitimate", making **FEIGELIS'** statement a defamatory and libelous mischaracterization of the Plaintiff's actions.

149. **FEIGELIS** published this false mischaracterization with the purpose and intended effect of discriminating against Dr. Loggins and piggybacking on **STANFORD**'s misconduct of verifying its suspension of Dr. Loggins to cause further injury to Plaintiff's professional reputation.

150. **FEIGELIS'** publishing the testimony and infographic referenced above has proximately harmed Plaintiff by negatively impacting his ability to return to and/or obtain professional employment.

151. **FEIGELIS'** publishing the testimony and infographic referenced above has proximately harmed Plaintiff by causing persons in his chosen profession to form an unfavorable opinion of Plaintiff.

152. Upon information and belief, **FEIGELIS** published the testimony and infographic referenced above, because Plaintiff had expressed opinions critical of the Israeli government and he felt empowered to do so because of **STANFORD**'s, **SALLER**'s and **MARTINEZ**'s failure to take effective remedial action and their failure to enforce the school's regulations as it relates to the privacy and confidentiality of African American, Muslim, and non-Caucasian employees like Dr. Loggins.

**153.** Upon information and belief, when **FEIGELIS** published the testimony and infographic referenced above, he knew and/or acted in reckless disregard to the fact that there was nothing to corroborate his claims since he was not present for the lectures at issue.

**154. FEIGELIS'** publishing the testimony and infographic referenced above was so reckless, wanton, irresponsible, willful, and malicious that **FEIGELIS** and **STANFORD** should be punished by the assessment of punitive damages.

**155. STANFORD** is responsible as well under the doctrine of *Respondeat Superior*.

**156. FEIGELIS'** statements refer to Plaintiff by name, were made of and concerning him, and were so understood by those who heard it.

**157.** **FEIGELIS'** false statements about Plaintiff are libelous, defamatory, and slanderous on their face and clearly expose Dr. Loggins to hatred, contempt, ridicule, and obloquy.

**158. FEIGELIS'** false statements have been seen by an untold number of readers since they were publicly posted to the Congressional Docket in or around March 2024.

**159. FEIGELIS'** false statements about Plaintiff were not privileged.

**160. FEIGELIS'** published his false statements about Plaintiff with common law malice, knowing them to be false or with reckless disregard for the truth.

**161.** Moreover, as a **STANFORD** graduate student and employee, his statements referencing Dr. Loggin's classroom lecture made it appear, albeit falsely, that his statements were based on inside knowledge gleaned from an ongoing investigation and were thus sanctioned by the university.

**162.** It is clear that despite Plaintiff's excellent work performance, Defendants **ANDERSON**, **EDELSTEIN, SENGUPTA, MARTINEZ**, **SOROKA**, **FEIGELIS** and **SALLER**, with **STANFORD**'s approval, devised a plan to pretextually terminate his employment based on protected characteristics, and complaints about their discrimination due to his race, color,

1
2
religion, and political affiliations, and in retaliation for engaging in protected activity by complaining about Defendants' wrongdoing.

3
4
5
**163.** By way of example, on or about March 25, 2024, **ANDERSON** sent Plaintiff correspondence on behalf of **STANFORD**, reporting the outcome of their investigation into Plaintiff's October 11, 2023, lecture.

6
7
8
9
10
11
12
**164. ANDERSON** and **STANFORD** confirmed that "[t]he neutral fact finders concluded that <u>the evidence did not establish that [Plaintiff] intended to target Jewish or Israeli students for different treatment</u>. The investigators discovered quite wide differences in the way [Plaintiff's] actions were perceived by different students, and in light of these differences, <u>the evidence did not support a finding that [Plaintiff] intentionally or objectively discriminated against any of the students</u>."

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stanford | VPUE**
Vice Provost for Undergraduate Education

Office of Academic Advising • Bing Overseas Studies Program
Center for Teaching and Learning • Haas Center for Public Service
Program in Writing & Rhetoric • Stanford Introductory Studies • Vice Provost's Office

March 25, 2024

Dr. Ameer Loggins
109 Soledad Lane
San Pablo, CA   94806-5064

Dear Ameer,

I write to report the outcome of the investigation into events surrounding the two sections of "Why College?" that you taught on October 11, 2023.

After those classes, some students came forward with a complaint that, among other things, you departed from the common syllabus of the course in order to devote the class session to discussion of the conflict in Gaza, and that you targeted Jewish and Israeli students during exercises designed to depict your view of the conflict. Stanford takes very seriously all allegations of students being targeted based on their religious or national identity—these are civil rights protections of enormous importance—so we initiated an immediate and full investigation. Now that it is complete, this letter reports the main findings to you.

The neutral fact finders concluded that the evidence did not establish that you intended to target Jewish or Israeli students for different treatment. The investigators discovered quite wide differences in the way your actions were perceived by different students, and in light of these differences, the evidence did not support a finding that you intentionally or objectively discriminated against any of the students. That said, the facts they established did raise substantial concerns that the pedagogical strategies you adopted during the sections were unwise and might have been predicted to lead to a bad educational outcome. Some students were in fact deeply upset by what transpired.

The most troubling complaints concerned your request that students identify their ethnic and national-origin backgrounds, which included protected identities, and two of your demonstrations: one that used a student based on their physical characteristics (size or stature) to represent a relatively powerless actor while you played the role of a more powerful actor by taking away the student's things, etc., and a second demonstration in which you asked about each student's national origin, and labeled that nation or culture as "colonizer" or "colonized." While you believed that these demonstrations would elicit greater personal engagement from the students with certain points you wished to make, they created substantial risk that students' emotional responses would interfere with the goal of understanding rather than promoting it.

There were relevant contextual considerations that you should have taken into account. Specifically, your students were new undergraduates in their first quarter, participating in a required class. The two classes took place only four days after the violent Hamas attack against Israel on October 7, when many people on our campus were acutely fearful, or angry, or both. In addition, a great many students perceived you to have clear sympathies in the emerging conflict, which predictably led to some students who disagreed with your perceived view to feel

COMPLAINT

**Stanford** | **VPUE**
Vice Provost for Undergraduate Education

Office of Academic Advising • Bing Overseas Studies Program
Center for Teaching and Learning • Haas Center for Public Service
Program in Writing & Rhetoric • Stanford Introductory Studies • Vice Provost's Office

uncomfortably silenced in the discussion. In these circumstances, the heightened emotional register brought on by your demonstrations increased the risk that some students—especially ones who disagreed with your apparent sympathies in the wider conflict—would feel alienated or even targeted, which is in fact what happened. It was very unwise to introduce such a heated topic, and one for which the first-year students were so unlikely to be prepared, given its apparent distance from the announced topic of the class (on the syllabus), and their relative inexperience with college level learning and discussion.

In summary, while the evidence did not support a finding that you intentionally discriminated against the students, your pedagogical choices were very unadvisable, and some students did understandably feel that their point of view was rendered unwelcome in the discussion.

As you know, your Stanford appointment is scheduled to end on March 31, 2024, and as we have already arrived at the end of Winter Quarter, I find that you should remain on paid leave for the remainder of the contract term.

I hope the advice in this letter is useful to you and I wish you well in your future endeavors.

Sincerely,

R. Lanier Anderson
Vice Provost for Undergraduate Education (interim)

165. Despite the report finding that Plaintiff categorically did not discriminate against any of his students during his lecture, **ANDERSON** and **STANFORD** deliberately made the adverse employment decision to pretextually and wrongfully terminate Plaintiff's employment at **STANFORD** by refusing to extend his contract.

166. **ANDERSON** and **STANFORD**'s actions in this regard demonstrate the pretextual nature of their wrongful suspension, in light of the fact that **STANFORD** did not announce this publicly, in direct contrast to the public statements with which **STANFORD** proclaimed that it was suspending Plaintiff from teaching pending the very investigation that cleared his name.

**167. ANDERSON** and **STANFORD**'s actions in this regard were clearly discriminatory and retaliatory, given similarly-situated non-black, non-Muslim employees are not treated in this manner.

**168.** By way of another example, on or about March 27, 2024, **ANDERSON**, **EDELSTEIN, SENGUPTA** circulated a discriminatory and retaliatory internal communication on **STANFORD**'s behalf, maligning Plaintiff's "unwise pedagogical strategies" which had the purpose and effect of intimidating and humiliating Plaintiff and to diminish Plaintiff's professional reputation amongst his colleagues and co-workers.

As was widely reported at the time, the complaint alleged that Ameer departed from the assigned syllabus for the course to devote his class sessions that day to discussion of the conflict in Gaza, and that he targeted Jewish and Israeli students during certain classroom demonstrations. Because targeting individual students based on their religious or national identity would violate civil rights protections that Stanford takes very seriously, it was decided that there must be an immediate and full investigation. Such investigations always take time. To preserve the integrity of the inquiry while maintaining continuity in the education of the students, the University decided that the best course was to place Ameer on a paid administrative leave while the investigators did their work.

The investigation is now complete, and Ameer has been notified of the outcome. The neutral fact finders concluded that the most serious complaints about the sections—that individual students were targeted based on their identity, and subjected to actual or potential invidious discrimination—could not be sustained by a preponderance of the evidence. That said, the facts established in the investigation do raise substantial concerns that the pedagogical strategies Ameer used were unwise, and might have been predicted to lead to bad educational outcomes. Some students were in fact deeply upset by what transpired, and that led to bad learning outcomes for them and undesirable public and professional consequences for Ameer.

As the leadership for COLLEGE and SIS, we have reflected carefully on the whole body of facts and perceptions that were brought to light through the investigation. It is normally the case in interpersonal differences of this sort—and it was certainly the case here—that there were very wide gaps among the perceptions of different participants, which contributed to the conflict. Still, there are some fairly clear lessons that we can take away from the episode that can improve our teaching and increase the chances that we can avoid such outcomes for COLLEGE Lecturers in the future. Among them are the importance of building trust in the classroom environment (e.g., through course norms/expectations); awareness of the time it takes to build up such trust with students, modulating emotionally powerful classroom techniques and subordinating their emotional impact to the goal of understanding, and of course, the importance of maintaining awareness of the context in which our lesson plans must operate in order to achieve their educational goals (e.g., that we teach a required course, that our students are just beginning in college, that some topics are likely to unite our students around shared values whereas others are very likely to divide them sharply, and so on).

In addition to offering to discuss these issues with Ameer, we will incorporate what we have learned from this episode into our future training and team-building activities for the SIS Lecturer cohort, so that we can all become more effective at reaching our students. These training improvements are intended to minimize the chances that our instructors will stumble into negative outcomes. In that work, we will be counting on your help and your ideas as we collaborate to create an educational environment in which all of us have voice and a place for our ideas, even as the enterprise brings together instructors and students from widely divergent backgrounds and perspectives for (sometimes intense) conversations about difficult questions. Our twin overarching goals are for you to have all the skills and support you need in the classroom, and for our students to have the best possible educational experience.

Ameer worked in our program for a number of years, and many of you have been not only his colleagues, but his friends. Even though his contract with us comes to an end as of the end of this quarter, we wish him well in his future career.

Best,

R. Lanier Anderson (interim Vice Provost)

Dan Edelstein (Faculty Director, SIS)

Parna Sengupta (Director, SIS)

1
2
3

**169.** In their email, **STANFORD, LANIER, EDELSTEIN,** and **SENGUPTA** indicated that they were forced to investigate because of the potential that Plaintiff violated the law.

4
5
6
7
8

**170.** However, **STANFORD** and the named defendants, including **FEIGELIS, ANDERSON, EDELSTEIN, SENGUPTA** did not do the same thing to **BANKMAN** who was on faculty and accused of illegal actions involving contributions to **STANFORD** and to a **STANFORD** law student.

9
10
11

**171.** But for the fact that Plaintiff was black, Muslim and spoke out against Israeli policies that violated the Geneva Convention, he would not have been treated in this discriminatory fashion.

12
13

**172.** Likewise, the email sent by **ANDERSON, EDELSTEIN** and **SENGUPTA** disclosed confidential personnel records in violation of school policies.

14
15
16
17

**173.** This violation was clearly discriminatory since **STANFORD, ANDERSON, EDELSTEIN,** and **SENGUPTA** does not disclose confidential information regarding its non-African American and/or non-Muslim employees.

18
19

**174.** These actions were clearly retaliatory as the statements contained therein were meant to discourage other employees from engaging in protected activity.

20
21
22
23
24
25

**175.** Since **STANFORD**'s wrongful suspension, pursuant to their plan to terminate Plaintiff's employment, and **STANFORD, SALLER, MARTINEZ** and **FEIGELIS**' separate defamatory public statements, Plaintiff has been denied a teaching appointment at **STANFORD** and has been harmed economically due to Defendants discrimination and harm to his professional reputation.

26
27

**176.** **ANDERSON**, **SENGUPTA**, **EDELSTEIN**, and **STANFORD**'s actions in this regard also demonstrate the pretextual nature of their wrongful suspension.

28

COMPLAINT

1
2
3

**177.** In light of the fact that Plaintiff was cleared of allegations he targeted Jewish students or otherwise discriminated against any student, **DEFENDANTS'** failure to disclose this important information underscores the retaliatory nature of their actions.

4
5

**178.** **DEFENDANTS'** actions in this regard were clearly discriminatory, given similarly-situated non-black, non-Muslim employees are not treated in this manner.

6
7
8

**179.** **STANFORD**'s actions in this regard are clearly discriminatory, given white, Caucasian, Jewish, and pro-Israeli employees are not treated in this manner.

9
10
11
12
13

**180.** The totality of these acts demonstrates a pattern of **STANFORD** failing to prevent or address incidents of discrimination, failing to implement antidiscrimination policies, and failing to adequately train staff concerning civil rights issues, confidentiality of personnel matters and investigations, as well as retaliation intentionally perpetrated by the **STANFORD** management and staff.

14
15
16
17
18

**181.** Defendants discriminated against and continue to discriminate against Plaintiff on the basis of his race, color, religion, political affiliations, and because Plaintiff complained or opposed the unlawful conduct of Defendants related to the above protected classes. Defendants retaliated against Plaintiff for engaging in protected activity.

19
20

**182.** The above are just some examples of **STANFORD**'s unlawful discrimination of, harassment of, and retaliation against Plaintiff.

21
22
23
24

**183.** As a result of **STANFORD**'s unlawful and discriminatory actions, Plaintiff has endured unlawful humiliation resulting in extreme emotional distress, severe depression, extreme anxiety, physical ailments, and financial loss.

25
26
27

**184.** As a result of **STANFORD**'s actions, Plaintiff has been and continues to feel extremely humiliated, degraded, victimized, marginalized, embarrassed, and emotionally distressed.

28

**185.** As a result of **STANFORD**'s actions, Plaintiff has begun a course of treatment to prevent anxiety and depression directly related to the above-mentioned misconduct.

**186.** As a result of **STANFORD**'s unlawful and discriminatory actions, Plaintiff has endured financial harm and irreparable damage to his professional reputation.

**187.** Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

**188.** Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

**FIRST CAUSE OF ACTION**
**Race discrimination**
**(42 U.S.C. §1981)**

**189.** Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

**190.** Defendants' conduct, by and through their agents, in treating the Plaintiff in a manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of his race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of his employment.

**191.** **STANFORD** in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected, despite the Defendants' knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of 42 U.S.C. § 1981 in the terms, conditions, and privileges of his employment. The discrimination Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter his working conditions and cause emotional distress.

**192.** The discriminatory acts of the Defendants as described above were intentional and would not have occurred but for the fact that Plaintiff is African American.

193. Defendants engaged in an ongoing and continuous pattern and practice of intentional discrimination against the Plaintiff up until his unlawful suspension and contract termination.

194. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of 42 U.S.C. § 1981.

195. Defendants violated the above and Plaintiff suffered numerous damages as a result.

### SECOND CAUSE OF ACTION
### Discrimination
### (Cal. Gov. Code, § 12940, subd. (a).)

196. Plaintiff alleges this second and separate cause of action against Defendants.

197. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

198. At all times relevant to this Complaint, the FEHA and its implementing regulations were in full force and effect and were binding on Defendants.

199. Under Government Code section 12940, subdivision (a), it is an unlawful employment practice for an employer to discriminate against an employee based upon the employee's protected characteristics, including race, skin color, and religion.

200. Defendants discriminated against Plaintiff for Plaintiff's protected characteristics, including race, skin color, and religion.

201. At all relevant times, Plaintiff was qualified for his position with Defendants.

202. Defendants subjected Plaintiff to the adverse employment actions described hereinabove.

203. Plaintiff's protected characteristics were a substantial motivating factor for Defendants' discriminatory conduct.

204. As a result of Defendants' discriminatory conduct, Plaintiff was harmed reputationally, professionally, emotionally, economically and threatened.

**205.** Defendant's discriminatory conduct was a substantial factor in causing Plaintiff's harm.

### THIRD CAUSE OF ACTION
### Retaliation
### (Cal. Gov. Code, § 12940, subd. (h).)

**206.** Plaintiff alleges this third and separate cause of action against Defendants.

**207.** Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

**208.** At all times relevant to this Complaint, the FEHA and its implementing regulations were in full force and effect and were binding on Defendants.

**209.** It is an unlawful employment practice to discharge, expel, or otherwise discriminate against any person because the person has engaged in protected activity under Cal. Gov. Code § 12940(h).

**210.** Defendants took the adverse employment actions against Plaintiff described hereinabove.

**211.** Either Plaintiff's oppositional activity and/or participation in proceedings related to the FEHA was a substantial motivating reason for Defendants' retaliatory conduct.

**212.** Plaintiff was harmed.

**213.** Defendants' retaliatory conduct was a substantial factor in causing Plaintiff's harm.

### FOURTH CAUSE OF ACTION
### Failure to Prevent FEHA Violations
### (Cal. Gov. Code, § 12940, subd. (k).)

**214.** Plaintiff alleges this fourth and separate cause of action against Defendants.

**215.** Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

COMPLAINT

**216.** At all times relevant to this Complaint, the FEHA and its implementing regulations were in full force and effect and were binding on Defendants.

**217.** California Government Code section 12940, subdivision (k), required a covered employer to take all reasonable steps to prevent employment practices prohibited by the FEHA from occurring.

**218.** Plaintiff was subjected to employment practices prohibited by the FEHA.

**219.** Defendants failed to take all reasonable steps to prevent these employment practices prohibited by the FEHA from occurring.

**220.** Plaintiff was harmed.

**221.** Defendants' failure to take all reasonable steps to prevent these employment practices prohibited by the FEHA from occurring was a substantial factor in causing Plaintiff's harm.

**FIFTH CAUSE OF ACTION**
**Retaliation in Violation of LABOR CODE § 98.6**

**222.** Plaintiff alleges this fifth and separate cause of action against Defendants.

**223.** Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

**224.** Labor Code § 98.6 provides, in pertinent part, as follows: "(a) No person shall discharge an employee or in any manner discriminate against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter..."

**225.** In committing the acts herein alleged, Defendants violated Labor Code § 98.6 in that Defendants retaliated against and suspended Plaintiff for making complaints about violations as set forth herein, including without limitation being harassed and retaliated against.

1
2

**226.** Plaintiff incurred damages as a result of Defendants' conduct that violated clear public policy, which is articulated herein.

3
4
5
6

**227.** As a proximate result of Defendants' conduct, Plaintiff has suffered actual, consequential, and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial.

7
8
9

**228.** Plaintiff claims such amounts as damages together with prejudgment interest pursuant to California Civil Code §§ 3287 and 3288.

10
11
12

**229.** As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress and has incurred, and will likely incur, medical expenses as a result.

13
14
15
16

**230.** Plaintiff is informed and believes and therefore alleges that he will continue to experience said pain and physical and emotional suffering for a period in the future he cannot presently ascertain, all in an amount subject to proof at the time of trial.

17
18
19
20

**231.** As a proximate result of the wrongful acts of Defendants, Plaintiff has been forced to hire attorneys to prosecute his claims herein and has incurred and is expected to continue to incur attorneys' fees and costs in connection therewith. Plaintiff is entitled to reasonable and necessary attorney's fees in order to enforce his rights and obtain benefits due him.

21
22
23
24

**232.** An employee who was discharged or otherwise suffered an adverse employment action in violation of Labor Code §§ 98.6 and/or 1102.5 is entitled to reinstatement and reimbursement for lost wages.

25
26

**SIXTH CAUSE OF ACTION**
**Discrimination in Violation of Title VII**

**233.** Plaintiff alleges this sixth and separate cause of action against Defendants.

27
28

234. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

235. Title VII states in relevant part as follows:

(a)Employer practices: It shall be an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race**, **color**, sex, or national origin.

236. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq.*, as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violations of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race, color, and religion.

237. STANFORD engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by subjecting Plaintiff to discrimination on the basis of Plaintiff's race, color, and religion.

238. STANFORD engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq.*, by harassing and otherwise discriminating against Plaintiff as set forth herein.

239. STANFORD violated the above and Plaintiff suffered numerous damages as a result.

WHEREFORE, Plaintiff prays for relief as set forth below.

**SEVENTH CAUSE OF ACTION**
**Retaliation in Violation of Title VII**

240. Plaintiff alleges this seventh and separate cause of action against Defendants.

Page 49

COMPLAINT

241. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

242. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

243. STANFORD engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions, or privileges of employment because of Plaintiff's opposition to the unlawful employment practices of STANFORD.

244. STANFORD violated the above and Plaintiff suffered numerous damages as a result.

WHEREFORE, Plaintiff prays for relief as set forth below.

**EIGHTH CAUSE OF ACTION**
**Defamation in Violation of the Common Law**

245. Plaintiff alleges this eighth and separate cause of action against Defendants.

246. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

247. Each of the aforementioned false, defamatory statements is about and concerns Plaintiff.

248. Each of the aforementioned false, defamatory statements was published to a broad audience.

249. Each of the aforementioned false, defamatory statements is false.

COMPLAINT

250. Defendants **FEIGELIS** and **STANFORD** knew each of the aforementioned false, defamatory statements was false at the time she made them, and/or she acted with reckless disregard as to their truth or falsity, and/or at a minimum, negligently.

251. Defendants **FEIGELIS** and **STANFORD** deliberately published each of the aforementioned false, defamatory statements knowing they would be disseminated to a broad audience and would harm Plaintiff's reputation and good standing.

252. Defendants **FEIGELIS** and **STANFORD** acted with spite and malice when making each of the aforementioned false, defamatory statements.

253. Defendants **FEIGELIS** and **STANFORD** intended that each of the aforementioned false, defamatory statements would inflict harm on the Plaintiff and, indeed, did inflict serious harm, including but not limited to severe emotional distress.

254. Defendants **FEIGELIS** and **STANFORD** are liable to Plaintiff for the common law tort of defamation.

255. Defendants **FEIGELIS** and **STANFORD** made the aforementioned false, defamatory statements as part of a deliberate campaign to threaten and intimidate Plaintiff, and, indeed, repeatedly threatened to harm Plaintiff by making statements that they knew were false and defamatory, in order to try to force Plaintiff to accede to their demands by threatening to harm Plaintiff's reputation. Defendants **FEIGELIS** and **STANFORD**'s conduct was outrageous, deliberate, malicious, and motivated by ill-will. Their defamatory statements were deliberate falsehoods, part of a prolonged effort to bully Plaintiff into acceding to their demands.

256. As the tortious actions of the Defendants were callous, reckless, willful without justification and in total disregard of Plaintiff's rights, Plaintiff is entitled to punitive and compensatory damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

1

### **PRAYER FOR JUDGMENT**

2

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants,

3

containing the following relief:

4

    A.  A declaratory judgment that the actions, conduct and practices of Defendants

5

          complained of herein violate the laws of the State of California;

    B.  An injunction and order permanently restraining Defendants from engaging in such

6

          unlawful conduct;

7

    C.  An award of damages in an amount to be determined at trial, but in any event in

8

          excess of the jurisdictional limit of any other court which might otherwise have

          jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all

9

          monetary and/or economic damages, including but not limited to, the loss of past and

          future income, wages, compensation, seniority, and other benefits of employment;

10

    D.  An award of damages in an amount to be determined at trial, but in any event in

11

          excess of the jurisdictional limit of any other court which might otherwise have

12

          jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all

          non-monetary and/or compensatory damages, including but not limited to,

13

          compensation for their severe mental anguish and emotional distress, humiliation,

          embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal

14

          dignity, emotional pain and suffering and other physical and mental injuries;

15

    E.  An award of damages for any and all other monetary and/or non-monetary losses

          suffered by Plaintiff in an amount to be determined at trial, but in any event in excess

16

          of the jurisdictional limit of any other court which might otherwise have jurisdiction

17

          over this matter, plus prejudgment interest;

    F.  An award of punitive damages, in an amount to be determined at trial, but in any

18

          event in excess of the jurisdictional limit of any other court which might otherwise

19

          have jurisdiction over this matter;

    G.  An order that Defendants make restitution to Plaintiff due to their unlawful business

20

          practices as described herein pursuant to California Business and Professions Code

21

          §§ 17200-17205;

    H.  An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's

22

          reasonable attorneys' fees to the fullest extent permitted by law; and

23

    I.  Such other and further relief as the Court may deem just and proper.

24

### **REQUEST FOR TRIAL BY JURY**

25

    Plaintiff hereby requests trial by jury to the fullest extent provided by law.

26

27

Dated:        April 8, 2024
             New York, New York

28

COMPLAINT

Respectfully submitted,
/s/ Tracey L. Brown
Tracey L. Brown, Esq.
The Cochran Firm
55 Broadway, 23rd Floor
New York, NY 10006
T: (212) 553-9215
F: (212) 227-8763
tbrown@cochranfirmny.com

COMPLAINT